**CSD 1171** [04/06/11]
Name, Address, Telephone No. & I.D. No.

> Christine E. Baur, SBN 207811
> Rayla D. Boyd, SBN 256788
> LAW OFFICE OF CHRISTINE E. BAUR
> 4653 Carmel Mountain Road, Suite 308 #332
> San Diego, CA 92130
> Telephone: (858) 350-3757
> Attorneys for Debtor Thomas L. Lackman

### UNITED STATES BANKRUPTCY COURT
#### SOUTHERN DISTRICT OF CALIFORNIA
325 West "F" Street, San Diego, California 92101-6991

In Re

Thomas L. Lackman

BANKRUPTCY NO.    10-10177-LT11

Tax I.D.(EIN)#:_____/S.S.#:XXX-XX-<u>7083</u>    Debtor.

---

## DEBTOR'S MOTION TO VALUE REAL PROPERTY,
## TREAT CLAIM AS UNSECURED AND AVOID JUNIOR LIEN OF

### Bank of America Home Loans, FKA Countrywide Home Loans Inc.
### (Affected Lien Holder)

**A.    Lien, Claim and Property at Issue:**    In connection with approval of its Amended Disclosure Statement dated March 13, 2012 with proposed Amended Plan of Reorganization dated March 13, 2012 as Exhibit "A"

("Plan"),  Debtor moves to value and avoid the junior deed of trust, mortgage or other encumbrance of _____

Bank of America Home Loans, FKA Countrywide Home Loans Inc.

("Affected Lien Holder"), recorded on ___06/02/2006___ as instrument number ___20060751931___

in the official records of _Maricopa County Recorder_("Affected Lien") encumbering the real property commonly known as

_40003 N Pride Dr., Anthem, Arizona_

and more fully described as *(insert legal description or attach exhibit)*:_____

_See Exhibit "A"_    ("Property").

The Property:

☐    Is the Debtor's primary residence; or

☒    Is NOT the Debtor's primary residence.

Associated Claim:

☐    The Affected Lien Holder filed a proof of claim on _____ assigned Claim No. _____,

which is associated with the Affected Lien ("Claim"); or

☒    As of the date of this Motion, Affected Lien Holder has not filed a proof of claim associated with the Affected Lien.

1123(b)(5)
Pursuant to 11 U.S.C. §§ 506(a) and ~~1322(b)(2)~~, the Affected Lien may be avoided upon completion of Plan

payments after confirmation of the Plan. The Claim will be treated in the Plan as an unsecured claim, and may be satisfied

by discharge or other order of the Court.

**B.**     **Petition Date:** ___6/11/10___

**C.**     **The Motion is timely under Local Bankruptcy Rule 3015-10(c) as follows:**     N/A

☐     The Motion is filed within twenty-eight days after the Claim was filed;

☐     The Affected Lien Holder did not file a proof of claim, but the Motion is filed within twenty-eight days after the

claims bar date of _____; or

☐     The Court entered an order on _____ setting _____ as the deadline to file the Motion.

**D.**     **Service of the Motion on the Affected Lien Holder complies with Fed. R. Bankr. P. 7004 ("Rule 7004") as**

**follows:**

☒ Service was accomplished under Rule 7004(h):

☒     By certified mail addressed to a specifically named officer of the institution;

☐     Other:

OR

☐     The Affected Lien Holder is **not** an Insured Depository Institution, as defined in section 3 of the Federal Deposit

Insurance Act and 11 U.S.C. § 101(35), and service was made by first-class mail:

☐     Upon an individual under Rule 7004(b)(1);

☐     Upon a domestic or foreign corporation or upon a partnership or other unincorporated association under

Rule 7004(b)(3); or

☐     Other:

**E.**     **Service on Proof Claim Address:**

☐     Affected Lien Holder was served at the address designated for receipt of notices and to the attention of the person

filing the Claim; or

☒     As of the date of this Motion, Affected Lien Holder has *not* filed a proof of claim.

**F.**     **Value of the Property is:** ___$240,000.00___, as of ___11/24/2010___. This opinion of value is based on the

following admissible evidence:

☒     Declaration of Appraiser or Real Estate Broker

☐     Declaration of Owner based on personal familiarity with the Property, or

☐     Other:

and is attached as Exhibit ___"B"___.

**G.    Senior Debt:** The deeds of trust, mortgages or other liens encumbering the Property which are senior in priority to the Affected Lien ("Senior Debt"):

| Creditor | Priority | Balance Owed/Date |
|---|---|---|
| The Bank Of New York Mellon FKA The Bank of New York, as Trustee for the Certificateholders, CWALT, Inc., Alternative Loan Trust 2006-HY12, Mortgage Pass-through Certificates, Series 2006-HY12 | First | $421,768.52 |

This information is supported by admissible evidence (*e.g.* Proof of Claim attached as exhibit or a recent statement from the Creditor, submitted with the Debtor's declaration)    See Proof of Claim attached as Exhibit "C"

**Total Senior Debt:**  $421,768.52

**Prayer:**

WHEREFORE, Debtor prays that this Court issue an Order which finds and determines that:

1.    The Property is valued at no more than $   240,000.00                  ;

2.    The balance owing on the Senior Debt exceeds the value of the Property and the Affected Lien is wholly unsecured and the Claim may be satisfied through the Plan as an unsecured claim;

3.    The Claim will be paid pursuant to the Plan as a non-priority general unsecured claim to the extent allowed. If Affected Lien Holder has not filed a proof of claim, and the deadline to file unsecured claims has expired, Affected Lien Holder has an extension of the deadline until 60 days after the date of entry of the Order;

4.    Upon completion of payments under the confirmed Plan, and entry of the resulting discharge, the Affected Lien will be deemed fully satisfied, and Affected Lien Holder is required to reconvey and release the Affected Lien. If the Affected Lien Holder fails to release the Affected Lien within the time required by applicable state law, the Debtor may file a motion requesting an order to extinguish the Affected Lien;

5.    If this case is dismissed or converted to Chapter 7, the Affected Lien Holder shall retain its lien for the full amount due under the corresponding note;

6.    Debtor's counsel is authorized to add, in connection with Plan Confirmation, the guideline fee as reflected in the Rights and Responsibilities Statement for motions of this type and costs subject to proof, or additional fees through fee application.

7.    ☐    See attached continuation page for additional provisions.


Dated: March 13, 2012

/s/ Christine E. Baur

[Attorney for] Debtor

# EXHIBIT "A "

Escrow No. **257-4602803** (**KAK**)

LOT 304, OF ANTHEM UNIT 8 CORRECTIVE, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 525 OF MAPS, PAGE 28 AND CERTIFICATE OF CORRECTION RECORDED AS 2000-0721936 AND AS 2000-0972082 OF OFFICIAL RECORDS.

Unofficial Document

1  Christine E. Baur, State Bar No. 207811
   Rayla D. Boyd, State Bar No. 256788
2  **LAW OFFICE OF CHRISTINE E. BAUR**
   4653 Carmel Mountain Road, Suite 308 #332
3  San Diego, CA 92130
   Telephone: (858) 350-3757
4  Facsimile: (858) 876-9480

5  Attorneys for Thomas L. Lackman, Debtor

6

7              UNITED STATES BANKRUPTCY COURT

8              SOUTHERN DISTRICT OF CALIFORNIA

9  In re                          Case No. 10-10177-LT11

10 THOMAS L. LACKMAN,             Chapter 11

11                                **DECLARATION IN SUPPORT OF**
            Debtor.               **DEBTOR'S MOTION TO VALUE**
12                                **REAL PROPERTY, TREAT CLAIM AS**
                                  **UNSECURED AND AVOID JUNIOR**
13                                **LIEN OF BANK OF AMERICA HOME**
                                  **LOANS, FKA COUNTRYWIDE HOME**
14                                **LOANS INC.**

15                                Date:     April 25, 2012
16                                Time:     10:00 a.m.
                                  Dept:     3
17                                Judge:    Hon. Laura S. Taylor

18

19      I, Robert Fabrizio, Licensed and Certified Appraiser, hereby declare as follows:

20

21 1.      I am a licensed real estate appraiser in the State of Arizona. My State Certification number is

22 30060. If called upon to do so, I could and would testify to the following, all of which is in my

23 personal knowledge, unless stated otherwise.

24 2.      My professional qualifications are set out in my *Curriculum Vitae*, a copy of which is

25 attached hereto as Exhibit 1. I have been an Arizona Certified Residential Real Estate Appraiser

26 continuously since 1991. During that time, I have performed in excess of 2000 appraisals,

27 throughout Arizona and Maricopa county. My clients include various lenders, homeowners, and law

28

Law Office of
Christine E. Baur
4653 Carmel Mountain Road
Suite 308 #332
San Diego, CA 92130
(858) 350-3757

CASE NO 10-10177-LT11
DECLARATION

firms. I am current on all continuing education requirements in order to hold the title of Certified Residential Real Estate Appraiser.

3.     On or about November 24, 2010, at the request of Thomas L. Lackman (the "Debtor"), I personally inspected and prepared an appraisal of the residential property located at 40003 N. Pride Drive, Anthem, Arizona (the "Property").

4.     The methodology and data I used, and the conclusions I reached based upon same, are set forth in detail in the Residential Appraisal Report ("Appraisal") attached hereto as Exhibit "2" and incorporated herein by reference. I have no present or contemplated interest in the Property and the fee I received is in no manner contingent upon the value reported.

5.     The purpose of the Appraisal was to provide a credible opinion of the defined value of the subject property, given the intended use of the appraisal.

6.     Based on my inspection of the Property and study of pertinent factors, including variation in trends and an analysis of the neighborhood data, it is my opinion that, as of the date of the Appraisal, the market value of the Property is $240,000.00.


      I declare under penalty of perjury that the foregoing is true and correct. Executed at _____*9 Am*_____, Arizona, on this *12* day of January, 2012.




                                            *Robt Fahy*
                                            [name]

Law Office of
Christine E. Baur
Carmel Mountain Road
Suite 308 #332
San Diego, CA 92130
(858) 350-3757

CASE NO 10-10177-LT11
DECLARATION

**Exhibit 1**

# QUALIFICATIONS OF APPRAISER

**Robert Fabrizio, MAI, SRA**

## PROFESSIONAL EXPERIENCE
•**AZ Appraisal Group, Inc. -** *President (1995-Present) -* Scottsdale, Arizona

•**Bank of America NT&SA** *(formerly Security Pacific Bank Arizona, formerly Arizona Bank) - Appraisal Specialist (1987-1995) -* Phoenix, Arizona

•**Appraisal Analysts -** *Fee Appraiser (1985-1987) -* Mesa, Arizona

## EDUCATION
**MAI Designation ('94), SRA Designation ('89) -** *Appraisal Institute*
• *Standards of Professional Practice C-430 ('99)*
• *Highest & Best Use And Market Analysis-520 ('94)*
• *Report Writing & Valuation Analysis-540 ('93)*
• *Case Studies in R.E. Valuation-550 ('92)*
• *Standards of Professional Practice A&B/AZ Law ('91)*
• *Capitalization Theory & Techniques Part-1BB ('91)*
• *Applied Residential Property Valuation-102 ('87)*
• *An Introduction to Real Estate Appraising-101 ('86)*
• *Capitalization Theory & Techniques Part-1BA (85')*

**B.S. Degree, Business Administration, Real Estate ('85) -** *Arizona State University*
• *Investment Management-556 ('85)*
• *Real Estate Appraising-Income Property-402 ('85)*
• *Real Estate Appraising/Residential-401 ('84)*
• *Real Estate Development-441 ('84)*
• *Real Estate Principles-251 ('84)*
• *Real Estate Investment-456 ('85)*
• *Real Estate Law-411 ('84)*

**A.A. Degree, Business Administration ('83) -** *Scottsdale Community College*
• *Construction Methods-203 ('88)*
• *Business Communication ('82)*
• *Accounting Principles I ('81)*
• *Business Statistics-201 ('82)*
• *Accounting Principles II ('82)*
• *Business Law I-255 ('81)*

## SEMINARS
• *Dodd-Frank Act & Interagency Appraisal Guidelines ('11)*
• *The Uniform Appraisal Dataset from FNMA ('11)*
• *Perspectives from Commercial R.E. Review Appraisers ('11)*
• *USPAP Update ('10)*
• *Commercial Appraisal Engagement and Review Seminar ('09)*
• *Unleash the Data, Know Your Market Tools ('09)*
• *A Day With the Board ('09)*
• *Reviewing & Underwriting Appraisal Reports ('07)*
• *USPAP Update ('06)*
• *The Professional Guide to the URAR Report ('05)*
• *Business Practices & Ethics ('05)*
• *Reporting & Power Tools for Appraisers ('04)*

<u>**SEMINARS (cont.)**</u>
- *Small Hotel/Motel Valuation ('04)*
- *Loss Prevention Program For R.E. Appraisers ('04)*
- *Land Valuation Assignments ('04)*
- *37th Annual Litigation Seminar ('04)*
- *Appraising Manufactured Housing ('04)*
- *Standards of Professional Practice ('03)*
- *Apartment Appraisal ('03)*
- *Appraising Income Property ('02)*
- *Data Confirmation and Verification ('01)*
- *Environmental Problems & Land Values ('00)*
- *Land Planning & Zoning ('00)*
- *The Arizona Land Market ('99)*
- *Arizona Water Law ('99)*
- *The Arizona Property Tax System ('99)*
- *Foreclosures & Forfeitures ('99)*
- *Government Lands In AZ ('99)*
- *Subdivision Rules ('99)*
- *Fundamentals of R.E. Exchange('99)*
- *Appraising From Blueprints & Specifications ('99)*
- *Appraisal Review Residential Properties ('98)*
- *Alternative Residential Reporting Forms ('99)*
- *Fundamentals of Relocation Appr. ('98)*
- *Property Construction & Inspection ('97)*
- *The Appraiser's Complete Review ('94)*
- *HUD Lender Select Training ('96)*
- *Fair Lending and The Appraiser ('94)*
- *Understanding Lmtd Appraisals/General ('94)*
- *Fall Seminar ('93)*
- *Argus Training Workshop ('93)*
- *Standards of Professional Practice ('91)*
- *URAR Report Writing ('88)*

<u>**ASSOCIATION MEMBERSHIPS**</u>
- *Member of The Appraisal Institute (MAI designation) #19377*
- *Senior Residential Appraiser, Appraisal Institute (SRA designation) #19377*
- *Certified General Real Estate Appraiser, State of Arizona #30060*
- *Member of Employees Relocation Counsel (E.R.C.)*
- *Taxpayer Representative No. TXR034 (Superior Court of Arizona)*
- *Professional Instructor for Real Estate Appraisal (State of Arizona)*
- *Expert Witness, (Superior Court of Arizona & US Bankruptcy Court)*

**Exhibit 2**

Summary
# Residential Appraisal Report

File No. 15193

The purpose of this appraisal report is to provide the client with a credible opinion of the defined value of the subject property, given the intended use of the appraisal.

**PURPOSE**

Client Name/Intended User **Lackman, Thomas**  E-mail **tlackman@gmail.com**
Client Address **40003 N. Pride Drive**  City **Anthem**  State **AZ**  Zip **85086**
Additional Intended User(s) **None noted.**

Intended Use **This report is intended exclusively for use by the Client for bankruptcy purposes.  The purpose of the assignment is to develop an opinion of Market Value of the subject property, as defined in this report, as of the effective date of this appraisal report.**

**SUBJECT**

Property Address **40003 N. Pride Drive**  City **Anthem (mailing)**  State **AZ**  Zip **85086**
Owner of Public Record **Lackman, Thomas**  County **Maricopa**
Legal Description **Lot 304 Anthem Unit 8 Replat**
Assessor's Parcel # **203-05-923**  Tax Year **2010**  R.E. Taxes $ **2,292.62**
Neighborhood Name **Anthem**  Map Reference **KR-161; Page 45**  Census Tract **0303.78**
Property Rights Appraised  [X] Fee Simple  [ ] Leasehold  [ ] Other (describe)

**SALES HISTORY**

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Prior Sale/Transfer:  Date **n/a**  Price **n/a**  Source(s) **ARMLS/iLinks**
Analysis of prior sale or transfer history of the subject property (and comparable sales, if applicable)  **The appraiser has complied with Standards Rule 1-5b and 2-2b (ix) requiring the appraiser to analyze and report all sales of the subject property that occurred within the three (3) years prior to the effective date of the appraisal.  If this information was available to the appraiser, it will be reported here.**

Offerings, options and contracts as of the effective date of the appraisal  **No listings were noted for the subject property within the last 12 months.**

**NEIGHBORHOOD**

| Neighborhood Characteristics | | One-Unit Housing Trends | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|
| Location  [ ] Urban  [X] Suburban  [ ] Rural | | Property Values  [ ] Increasing  [ ] Stable  [X] Declining | | PRICE  AGE | | One-Unit  60 % | |
| Built-Up  [ ] Over 75%  [X] 25-75%  [ ] Under 25% | | Demand/Supply  [ ] Shortage  [X] In Balance  [ ] Over Supply | | $(000)  (yrs) | | 2-4 Unit  % | |
| Growth  [ ] Rapid  [X] Stable  [ ] Slow | | Marketing Time  [ ] Under 3 mths  [X] 3-6 mths  [ ] Over 6 mths | | 95 Low  1 | | Multi-Family  5 % | |

Neighborhood Boundaries **The neighborhood falls generally north of Desert Hills Drive, south of the Circle Mountain Rd. alignment, east of the I-17 Freeway, and west of 7th Avenue.**  High **725** 11  Commercial **10** %
Pred. **229** 6  Other **vacant** **25** %

Neighborhood Description  **See Attached Addendum.**

Market Conditions (including support for the above conclusions)  **See attached Addendum.**

**SITE**

Dimensions **100' x 72.64' x 100' x 57' ±**  Area **6,500± sf**  Shape **Mostly Rectangular**  View **Common Area to Rear**
Specific Zoning Classification **R1-7**  Zoning Description **Single-family Residential / Maricopa County**
Zoning Compliance  [X] Legal  [ ] Legal Nonconforming (Grandfathered Use)  [ ] No Zoning  [ ] Illegal (describe)
Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use?  [X] Yes  [ ] No  If No, describe. **See Attached Addendum.**

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street **Paved Asphalt** | [X] | |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley **None** | | |

Site Comments  **No adverse easements or encroachments noted, however, no survey or title report were available for review.  The site is generally level and slightly above street grade.  It's size is typical of most other lots in the subdivision.  The subject backs up to common area, which has a positive impact on the site.**

**IMPROVEMENTS**

| GENERAL DESCRIPTION | FOUNDATION | EXTERIOR DESCRIPTION  materials | INTERIOR  materials |
|---|---|---|---|
| Units  [X] One  [ ] One w/Acc. unit | [X] Concrete Slab  [ ] Crawl Space | Foundation Walls **Concrete/Avg.*** | Floors **Crpt&Tile/Avg.*** |
| # of Stories  **1&1/2** | [ ] Full Basement  [ ] Partial Basement | Exterior Walls **Stucco/Average*** | Walls **Drywall/Avg.*** |
| Type  [X] Det.  [ ] Att.  [ ] S-Det./End Unit | Basement Area  **n/a** sq. ft. | Roof Surface **ConcTile/Avg.*** | Trim/Finish **Wood/Avg*** |
| [X] Existing  [ ] Proposed  [ ] Under Const. | Basement Finish  **n/a** % | Gutters & Downspouts **AdeqOverhg/Avg*** | Bath Floor **Tile/Avg*** |
| Design (Style) **Multi-Level** | [ ] Outside Entry/Exit  [ ] Sump Pump | Window Type **Alumn.Sld./Avg.*** | Bath Wainscot **C.M./Avg*** |
| Year Built **2000** | | Storm Sash/Insulated **None** | Car Storage **None** |
| Effective Age (Yrs) **5** | | Screens **Yes/Avg.*** | [X] Driveway  # of Cars  **2** |
| Attic  [ ] None | Heating  [X] FWA  [ ] HW  [ ] Radiant | Amenities | Driveway Surface **Concrete** |
| [ ] Drop Stair  [ ] Stairs | [ ] Other  Fuel **Gas** | [X] Fireplace(s) # **1**  [X] Fence **Blk&View** | [X] Garage  # of Cars  **2.5** |
| [ ] Floor  [X] Scuttle | Cooling  [X] Central Air Conditioning | [X] Patio/Deck **Cov.**  [ ] Porch | [ ] Carport  # of Cars |
| [ ] Finished  [ ] Heated | [ ] Individual  [ ] Other | [X] Pool **in-ground**  [ ] Other | [ ] Att.  [ ] Det.  [X] Built-in |
| Appliances  [X] Refrigerator  [X] Range/Oven  [X] Dishwasher  [X] Disposal  [X] Microwave  [ ] Washer/Dryer  [ ] Other (describe) | | | |

Finished area **above** grade contains:  **10** Rooms  **4** Bedrooms  **3** Bath(s)  **3,141** Square Feet of Gross Living Area Above Grade
Additional Features  **Special features include, but are not limited to, water softener, ceiling fans, B/I TV niche, solid surface counters, stained wood cabinetry, laundry sink, W/I closet, outdoor fireplace.  Above ground spa considered personal property and not included in this analysis.**
Comments on the Improvements  **No readily observable or unusual physical deficiencies, adverse conditions or inadequacies were noted.  However, the appraiser lacks competency in this area and a licensed home inspector should be contacted if there are any concerns to any party involved.  No readily observable functional obsolescence noted.**

**\*Note: The appraiser is not an expert in this field.  If the above-mentioned conditions (&/or repairs, deterioration, renovations,  and/or remodeling, etc.) is of concern to any party involved, it is encouraged that an expert in the proper field be obtained.  The appraiser is not responsible for hidden or unapparent conditions.**



This form Copyright © 2005-2010 ACI Division of ISO Claims Services, Inc., All Rights Reserved.
(gPAR™) General Purpose Appraisal Report  12/2005
GPAR1004_05 05132010

# Residential Appraisal Report

File No. 15193

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 40003 N. Pride Drive Anthem (mailing) | 2362 W. Clearview Trail 203-40-699 | | 40835 N. Majesty Court 203-07-817 | | 3416 W. Thoreau Lane 203-10-591 | |
| Proximity to Subject | | 1.25 miles E | | 0.78 miles NE | | 0.16 miles SSW | |
| Sale Price | $ n/a | $ 250,000 | | $ 187,000 | | $ 190,000 | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 84.98 sq. ft. | | $ 70.59 sq. ft. | | $ 56.45 sq. ft. | |
| Data Source(s) | ARMLS/iLinks | ARMLS/iLinks 162 DOM | | ARMLS/iLinks 7 DOM | | ARMLS/iLinks 77 DOM | |
| Verification Source(s) | Inspection | MCR Dkt#10-0852415 | | MCR Dkt#10-0858049 | | MCR Dkt#10-0985739 | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | n/a | New Convent. | | Cash | | Cash | |
| Date of Sale/Time | 11/10 DOV | 09/10 COE | -5,000 | 10/10 COE | -1,900 | 11/10 COE | |
| Location | Average | Similar | | Similar | | Similar | |
| Leashold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 6,500± sf | 9,200± sf | -4,100 | 6,900± sf | | 6,200± sf | |
| View | Common Area | Common Area | | Common Area | | Common Area | |
| Design (Style) | Multi-Level/Avg. | Multi-lvl/Similar | | Multi-lvl/Similar | | Multi-lvl/Similar | |
| Quality of Construction | Average | Similar | | Similar | | Similar | |
| Actual Age | 2000 | 2003 | | 2001 | | 2000 | |
| Condition | Average | Similar | | Inferior | +15,000 | Inferior | +15,000 |
| Above Grade | Total 10 Bdrms. 4 Baths 3 | Total 9 Bdrms. 3 Baths 2.5 | +1,500 | Total 9 Bdrms. 4 Baths 2.5 | +1,500 | Total 10 Bdrms. 4 Baths 4 | -3,000 |
| Gross Living Area | 40 3,141 sq. ft. | 2,942 sq. ft. | 8,000 | 2,649 sq. ft. | 19,700 | 3,366 sq. ft. | -9,000 |
| Basement & Finished Rooms Below Grade | None | None | | None | | None | |
| Functional Utility | Average | Similar | | Similar | | Similar | |
| Heating/Cooling | Central HVAC | Central HVAC | | Central HVAC | | Central HVAC | |
| Energy Efficient Items | Standard | Standard | | Standard | | Standard | |
| Garage/Carport | 2.5 Garage | 3 Garage | -3,000 | 2 Garage | +3,000 | 2.5 Garage | |
| Porch/Patio/Deck | Covered Patio | Covered Patio | | Covered Patio | | Covered Patio | |
| | 1 Fireplace | No Fireplace | +1,000 | No Fireplace | +1,000 | No Fireplace | +1,000 |
| | Pool/No Spa | Pool/No Spa | | No Pool or Spa | +15,000 | No Pool or Spa | +15,000 |
| | | Short Sale | | Lender-owned | | Lender-owned | |
| Net Adjustment (Total) | | ☐ + ☒ - $ | 1,600 | ☒ + ☐ - $ | 53,300 | ☒ + ☐ - $ | 19,000 |
| Adjusted Sale Price of Comparables | | Net Adj. -0.6% Gross Adj. 9.0% $ | 248,400 | Net Adj. 28.5% Gross Adj. 30.5% $ | 240,300 | Net Adj. 10.0% Gross Adj. 22.6% $ | 209,000 |

Summary of Sales Comparison Approach    See Attached Addendum.

**COST APPROACH TO VALUE**

Site Value Comments   Because the subject is located in an established area, no land sales were available for comparison.

| | | |
|---|---|---|
| ☐ ESTIMATED  ☐ REPRODUCTION OR  ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE .................................... = $ | n/a |
| Source of cost data | Dwelling 3,141 Sq. Ft. @ $ ............... = $ | 0 |
| Quality rating from cost service      Effective date of cost data | Bsmt. 0 Sq. Ft. @ $ ............... = $ | 0 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | |
| The Cost Approach was not used due to the fact that this | Garage/Carport 0 Sq. Ft. @ $ ............... = $ | 0 |
| approach is typically not considered by purchasers in this market. | Total Estimate of Cost-New ........... = $ | 0 |
| Also, this approach does not test for the marketability of the | Less   Physical  Functional  External | |
| subject. | Depreciation | = $ ( ) |
| | Depreciated Cost of Improvements ....................... = $ | 0 |
| DOV = Date of value  COE = Close of escrow  NMD = No market | "As-is" Value of Site Improvements ...................... = $ | |
| difference  CD = Contract Date | | |
| | INDICATED VALUE BY COST APPROACH ............... = $ | n/a |

**INCOME APPROACH TO VALUE**

Estimated Monthly Market Rent $ n/a  X Gross Rent Multiplier n/a  = $ n/a  Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM) n/a

Indicated Value by: Sales Comparison Approach $ 240,000   Cost Approach (if developed) $ n/a   Income Approach (if developed) $ n/a

The quality and quantity of data appears to be relevant enough to provide an adequate analysis. The Sales Comparison Approach has good reliable data, is most recognized in determining market value, and is given most weight. The Cost Approach and Income Approaches are not typically used by purchasers in this market and not considered pertinent in estimating the subject's market value. Therefore, they were not used in this analysis.

This appraisal is ☒ "as is," ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed  ☐ subject to the following:

Based on the scope of work, assumptions, limiting conditions and appraiser's certification, my (our) opinion of the defined value of the real property that is the subject of this report is $  240,000  as of  11/24/2010  , which is the effective date of this appraisal.

**ADDENDUM**

**Neighborhood Description**

The subject property is located in extreme northern Metro-Phoenix. It is located within an unincorporated area of Maricopa County, however it uses an Anthem mailing address. The area has transitioned from natural desert & agricultural land to average to good quality single family tract homes.

Anthem is a master-planned community built by Del Webb/Pulte, which features country club golf courses, community parks, a recreational center and water park, common areas, schools and commercial retail centers. It is located within a reasonable proximity of schools, shopping, as well as most other normal amenities. The area consists of average to good quality single family homes of mixed age and construction. The subject is located just east of the I-17 (Black Canyon) Freeway. No unfavorable factors noted.

**Neighborhood Market Conditions**

Market conditions in the Metro-Phoenix area have experienced an increase in home demand since the early to mid 1990's. This demand has continued into the early 2000's due to relatively low interest rates and positive net in-migration. However, demand in residential real estate began to decline in late 2005. Although Metro-Phoenix was projected to have a 25% job growth over the next 10 years with a similar population growth, sales tax revenue is down and analysts project a slower local economy thru 2010. The National Bureau of Economic Research has concluded that the US was in a recession, however, this reportedly has passed. Currently, there is still an oversupply of homes in most market areas, however, this appears to be stabilizing.

New home sales activity appears to be slower than prior years, but still active. Although the market is generally in oversupply, resale activity appears to be stable, partially driven by the lower interest rates, as well as the positive net inmigration. A continued slow market is anticipated for the near term. However, considering general market trends as indicated by the recent sales, market prices appear to be stabilizing to improving in this neighborhood, as indicated by the generally stable listing prices (per the Market Conditions Analysis. However, historic prices have shown decline as indicated by the Market Conditions Analysis. Most competitively priced homes will sell in under 3 months.

Below are current listings from the subject's market area that help support the opinion of value.

| Price / Status / MLS # | Encoded Features | Approx SQFT | List Price | Year Built | Subdivision | Assessor Number |
|---|---|---|---|---|---|---|
| **$169,000**<br>40949 N WILD WEST TRL<br>Anthem, AZ 85086<br>Active / 4308731 | 42.5FRDXO2G | 2,704 | 169,000 | 2001 | ANTHEM | 203-01-860 |
| **$217,500**<br>3416 W KING DR<br>Phoenix, AZ 85086<br>Active / 4497613 | 42.75FRO2G | 2,803 | 217,500 | 2001 | Anthem | 203-05-903 |
| **$219,815**<br>40410 N HIGH NOON WAY<br>Anthem, AZ 85086<br>Active / 4461850 | 63FRDO3G | 3,238 | 219,815 | 2003 | Anthem | 203-06-629 |
| **$229,999**<br>40477 N HIGH NOON WAY<br>Phoenix, AZ 85086<br>Active / 4445294 | 52.5FEDO3G | 2,968 | 229,999 | 2003 | ANTHEM | 203-06-643 |
| **$234,900**<br>2334 W MEMORIAL CT<br>Phoenix, AZ 85086<br>Active / 4466865 | 53RDP3G | 3,361 | 234,900 | 2003 | Anthem | 203-40-181 |
| **$249,990**<br>40446 N HIGH NOON WAY<br>Phoenix, AZ 85086<br>Active / 4487205 | 63FRDO3G | 3,361 | 249,990 | 2003 | Anthem | 203-06-635 |
| **$255,000**<br>39627 N GRAHAM WAY<br>Anthem, AZ 85086<br>Active / 4445222 | 53FRDO3G | 3,361 | 255,000 | 2003 | Anthem | 203-40-622 |

**Highest and Best Use**

Based on a review of the subject's physically possible, legally permissible, financially feasible and maximally productive uses, the Highest and Best Use of the subject property "as improved" is for the building to continue in its existing use. This is based on the fact that the subject physically exists, is permitted by zoning, and to remove the improvements would produce an economic loss. The most probable buyer of the subject would be another home-owner, as supported by the purchase motivations behind the comparable sales.

**Comments on Sales Comparison**

The following analysis describes the reasoning behind the adjustments made to the comparable sales. A downward adjustment is typically made to a sale with a superior feature as compared to the subject. Likewise, an upward adjustment is made to a sale with an inferior feature as compared to the subject. Due to the diversity of sales within the subject's market area, meaningful support for the magnitude of the adjustments is difficult to derive. Paired sales are not always

# ADDENDUM

available and because of the narrow sampling of sufficiently similar properties, it may be difficult to quantify the adjustments attributed to all the variables present. Therefore, significant weight is given to input from buyers, sellers, brokers, as well as empirical data derived from the local markets. Data from the Marshall & Swift Residential Cost Handbook is also considered reliable information, tempered by the appraiser's professional experience. Adjustments for several categories are considered. Specific features of the sales that do not materially influence the value of the subject are typically not included in this analysis.

Adjustments for size differences were made based primarily on the market reaction to differences noted, as well as information obtained from the Marshall & Swift Cost Handbook, tempered by the appraiser's professional experience. Other adjustments such as bath count, fireplaces, pools and spas were also applied in a similar manner.

The comparables indicate an adjusted value range of between $209,000 to $248,400. The sales were adjusted for differences as noted, with most adjustments under 10% and within preferred guidelines. The sales are the most recent comparables from within the subject's market area and are given equal weight. The sales were adjusted downward based on these declining market conditions (12% annual decrease). One sale was used beyond the preferred one-mile guideline, due the comparability and recentness of the sale.

## Scope of Work
This is a Summary Report which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(b) of the Uniform Standards of Professional Appraisal Practice for a Summary Appraisal Report. As such, it does not present discussions of the data, seasonings and analyses that were used in the appraisal process to develop the appraiser's opinion of value. Supporting documentation concerning the data, reasoning, and analyses is retained in the appraiser's file. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated herein. The appraiser is not responsible for unauthorized use of this report.

The scope of this appraisal is specific to the needs to the client. In completing this assignment, a preliminary search of all available resources was made to determine market trends, influences and other significant factors pertinent to the subject property. The market data was analyzed through generally accepted appraisal methodology. The property has been identified previously in this report.

A complete visual inspection of the property was performed with photographs taken. Items included in this inspection are outlined in the report. As needed, inspections by various professionals within certain fields might be recommended with the final estimate of value subject to their findings. A three-year ownership history of the subject was researched. Recent sales, escrows and listings of comparable properties were researched and confirmed from public records, published market data, brokers, property managers, buyers and sellers, as appropriate and available. Data sources include, but are not limited to TEMPO, local MLS, FirstAmerican Title, and local County records.

All three approaches to value were considered in this valuation, with only the applicable approaches used. This report is intended to comply with the Uniform Standards of Professional Appraisal Practice and the appraisal requirements set forth by the appropriate federal regulatory bodies. The Intended Use is to evaluate the property, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value.

Certification (cont.)          I certify that, to the best of my knowledge and belief:

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are my personal, impartial, and unbiased professional analyses, opinions and conclusions.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- unless otherwise stated, any included elements of the property (including but not limited to mechanical refrigeration, air conditioning systems, heating, piping, plumbing, and other equipment) have not been specifically tested and are assumed to be in good working condition. The appraiser gives no assurance as to the soil conditions or structural integrity of the property which are assumed to be adequate.

- I have not performed a previous appraisal of the subject property within the three years prior to this assignment.

- I certify that, to the best of my knowledge and belief, the reported analysis, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute.

- The reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

- The use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, I, Robert Fabrizio, MAI, SRA, has completed the requirements under the continuing education of the Appraisal Institute.

- No one provided significant real property appraisal assistance to the person signing this certification.

- This report may contain electronic signatures. These signatures are placed in the report using a secure password and are

| Client: Lackman, Thomas | | File No.: 15193 | |
|---|---|---|---|
| Property Address: 40003 N. Pride Drive | | Case No.: | |
| City: Anthem (mailing) | State: AZ | | Zip: 85086 |

as valid and true as the originals.

**Extra Comments**
**Marketing/Exposure Time**
By researching sales of similar comparable residential properties with value ranges as identified in the Neighborhood section of this report, the appraiser believes that the exposure time for the subject property is equal to the indicated Marketing Time identified in the neighborhood section of this report.

**Analysis and Report Form**
The appraisal is based on the information gathered by the appraiser from public records, other identified sources, inspection of the subject property and neighborhood, and selection of comparable sales, listings, and/or rentals within the subject market area.

The original source of the comparable data described in the Data Source section of the market grid along with the source of confirmation provided, where available, the original source is presented first. The sources and data are considered reliable. Then conflicting information was provided, source deemed most reliable has been used. Data believed to be unreliable was not included in the report or used as a basis for the value conclusion. The extent of the analysis to this assignment is stated in the Appraiser's Certification included within this report.

## Scope of Work, Assumptions and Limiting Conditions

**Scope of work is defined in the Uniform Standards of Professional Appraisal Practice as " the type and extent of research and analyses in an assignment."  In short, scope of work is simply  what the appraiser did and did not do during the course of the assignment.  It includes, but is not limited to:  the extent to which the property is identified and inspected,  the type and extent of data researched,  the type and extent of analyses applied to arrive at opinions or conclusions.**

**The scope of this appraisal and ensuing discussion in this report are specific to the needs of the client, other identified intended users and to the intended use of the report.  This report was prepared for the sole and exclusive use of the client and other identified intended users for the identified intended use and its use by any other parties is prohibited.  The appraiser is not responsible for unauthorized use of the report.**

**The appraiser's certification appearing in this appraisal report is subject to the following conditions and to such other specific conditions as are set forth by the appraiser in the report.  All extraordinary assumptions and hypothetical conditions are stated in the report and might have affected the assignment results.**

1.  The appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or title thereto, nor does the appraiser render any opinion as to the title, which is assumed to be good and marketable.  The property is appraised as though under responsible ownership.

2.  Any sketch in this report may show approximate dimensions and is included only to assist the reader in visualizing the property.  The appraiser has made no survey of the property.

3.  The appraiser is not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made thereto.

4.  Neither all, nor any part of the content of this report, copy or other media thereof (including conclusions as to the property value, the identity of the appraiser, professional designations, or the firm with which the appraiser is connected), shall be used for any purposes by anyone but the client and other intended users as identified in this report, nor shall it be conveyed by anyone to the public through advertising, public relations, news, sales, or other media, without the written consent of the appraiser.

5.  The appraiser will not disclose the contents of this appraisal report unless required by applicable law or as specified in the Uniform Standards of Professional Appraisal Practice.

6.  Information, estimates, and opinions furnished to the appraiser, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the appraiser is assumed by the appraiser.

7.  The appraiser assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable.  The appraiser assumes no responsibility for such conditions, or for engineering or testing, which might be required to discover such factors.  This appraisal is not an environmental assessment of the property and should not be considered as such.

8.  The appraiser specializes in the valuation of real property and is not a home inspector, building contractor, structural engineer, or similar expert, unless otherwise noted.  The appraiser did not conduct the intensive type of field observations of the kind intended to seek and discover property defects.  The viewing of the property and any improvements is for purposes of developing an opinion of the defined value of the property, given the intended use of this assignment.  Statements regarding condition are based on surface observations only.  The appraiser claims no special expertise regarding issues including, but not limited to: foundation  settlement, basement moisture problems, wood destroying (or other) insects, pest infestation, radon gas, lead based paint, mold or environmental issues.  Unless otherwise indicated, mechanical systems were not activated or tested.

This appraisal report should not be used to disclose the condition of the property as it relates to the presence/absence of defects.  The client is invited and encouraged to employ qualified experts to inspect and address areas of concern.  If negative conditions are discovered, the opinion of value may be affected.

**Unless otherwise noted, the appraiser assumes the components that constitute the subject property improvement(s) are fundamentally sound and in working order.**

Any viewing of the property by the appraiser was limited to readily observable areas.  Unless otherwise noted, attics and crawl space areas were not accessed.  The appraiser did not move furniture, floor coverings or other items that may restrict the viewing of the property.

9.  Appraisals involving hypothetical conditions related to completion of new construction, repairs or alteration are based on the assumption that such completion, alteration or repairs will be competently performed.

10.  Unless the intended use of this appraisal specifically includes issues of property insurance coverage, this appraisal should not be used for such purposes.  Reproduction or Replacement cost figures used in the cost approach are for valuation purposes only, given the intended use of the assignment.  The Definition of Value used in this assignment is unlikely to be consistent with the definition of Insurable Value for property insurance coverage/use.

**11. The ACI General Purpose Appraisal Report (GPAR™) is not intended for use in transactions that require a Fannie Mae 1004/Freddie Mac 70 form, also known as the Uniform Residential Appraisal Report (URAR).**

**Additional Comments Related To Scope Of Work, Assumptions and Limiting Conditions**

- A complete visual inspection of the subject property INCLUDES the following:  Exterior & Interior observation of readily visible areas, a complete exterior measurement, an assessment of the floor plan and layout, notation of any readily visible special features, a verification of conformity to the neighborhood, observation of the general condition and/or any readily visible renovation or remodeling.

- A complete visual inspection of the subject property DOES NOT INCLUDE:  an inspection of the attics, crawl spaces and/or any difficult to access spaces, anything not readily observable or visible, testing of all window operations, testing &/or activation of mechanicals, private water or sewage disposal systems, personal property, code &/or zoning compliance.

- The term "Inspection", as used in this report, is not the same level of inspection that is required for a "Professional Home Inspection".  The appraiser does not fully inspect the electrical system, plumbing systems, mechanical systems, foundation systems, or subfloor.  The appraiser is not an expert in construction materials and the purpose of the appraisal is to make an economic evaluation of the subject property.  If the client needs a more detailed inspection of the property, a home inspection, by a Professional Home Inspector, is suggested.

- Livable conditions are defined as habitable and tolerable.  The appraiser is not a building inspector.  The appraiser does not investigate the legality of any improvements built on the site, with regard to building permits, certificates of occupancy, variances, or any other legal matters pertaining to the improvements.

- The appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.)  that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied.  Unless otherwise stated, any included elements of the property (including but not limited to  mechanical refrigeration, air conditioning systems, heating, piping, plumbing, and other equipment) have not been specifically tested and are assumed to be in good working condition.  The appraiser gives no assurance as to the soil conditions or structural integrity of the property which are assumed to be adequate.

- It is beyond the scope of this appraisal to research adverse site influences such as, but not limited to, criminal activity, location of sex offenders &/or interim rehabilitation facilities.  Insurance CLUE reports have not been reviewed.

- The scope of this appraisal is specific to the needs of the Client, the Intended User.  This appraisal is intended for use by the Client for bankruptcy purposes and is not intended for use by any other party, or for any other purpose.  If other parties choose to rely on the report, the appraiser is not obligated to such parties and does not result in such parties as intended users.  The Intended Use is to evaluate the property that is the subject of this appraisal for bankruptcy purposes, subject to the stated Scope of Work, purpose of the appraisal, reporting requirements of this appraisal report form, and Definition of Market Value.  No additional Intended Users are identified by the appraiser. The purpose of the assignment is to develop an opinion of Market Value, for the Client.

- The Sales Comparison is the only Approach used in this analysis.  The Cost Approach and Income Approaches have been omitted for this analysis because buyers are not purchasing real estate, or the subject type under this scenario.  The scope of the appraisal has been limited by the fact that a current title report was not available for review. Also, no environmental assessment of the property was made available to the appraiser.  It is assumed that the absence of these items will not adversely impact the value conclusions.

## Appraiser's Certification

**The appraiser(s) certifies that, to the best of the appraiser's knowledge and belief:**

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are the appraiser's personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. Unless otherwise stated, the appraiser has no present or prospective interest in the property that is the subject of this report and has no personal interest with respect to the parties involved.

4. The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. The appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8. Unless otherwise noted, the appraiser has made a personal inspection of the property that is the subject of this report.

9. Unless noted below, no one provided significant real property appraisal assistance to the appraiser signing this certification. Significant real property appraisal assistance provided by:

**Additional Certifications:**

Certification (cont.)      I certify that to the best of my belief,...
- I certify that, to the best of my knowledge and belief, the reported analysis, opinions and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Practice of the Appraisal Institute.

- I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report, I, Robert Fabrizio, MAI, SRA, have completed the requirements under the continuing education of the Appraisal Institute.

- This report may contain electronic signatures. The signature(s) affixed to this report, and certification, were applied by the original appraiser(s) or supervisory appraiser and represent their acknowledgements of the facts, opinions and conclusions found in the report. Each appraiser (s) applied his or her signature electronically using a password encrypted method. Hence these signatures have more safeguards and carry the same validity as the individual's hand applied signature. If the report has a hand-applied signature, this comment does not apply.

- The current Uniform Standards of Professional Appraisal Practice defines the market value conclusion as an opinion of market value and not an estimate of market value.

---

Definition of Value: [X] Market Value    [ ] Other Value: _____

Source of Definition: OTS Title 12 CFR, Part 564.2-Appraisals

Market value means the most probable price, which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition are the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;

2. Both parties are well informed or well advised, and acting in what they consider their own best interests;

3. A reasonable time is allowed for exposure in the open market;

4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

---

ADDRESS OF THE PROPERTY APPRAISED:
40003 N. Pride Drive
Anthem (mailing) 85086
EFFECTIVE DATE OF THE APPRAISAL: November 24, 2010
APPRAISED VALUE OF THE SUBJECT PROPERTY $ 240,000

**APPRAISER**

Signature: *Robert Fabrizio*
Name: Robert Fabrizio
State Certification # 30060
or License #
or Other (describe): _____ State #: _____
State: AZ
Expiration Date of Certification or License: 8/31/2012
Date of Signature and Report: 12/02/2010
Date of Property Viewing: 11/24/2010
Degree of property viewing:
[X] Interior and Exterior  [ ] Exterior Only  [ ] Did not personally view

**SUPERVISORY APPRAISER**

Signature: _____
Name: _____
State Certification # _____
or License # _____
State: _____
Expiration Date of Certification or License: _____
Date of Signature: _____
Date of Property Viewing: _____
Degree of property viewing:
[ ] Interior and Exterior  [ ] Exterior Only  [ ] Did not personally view



This form Copyright © 2005-2010 ACI Division of ISO Claims Services, Inc., All Rights Reserved.
(gPAR™) General Purpose Appraisal Report 12/2005
GPARLIM_05 08112008

# FLOORPLAN



Sketch by Apex IV Windows™

| AREA CALCULATIONS SUMMARY | | | |
|---|---|---|---|
| Code | Description | Size | Totals |
| GLA1 | First Floor | 2409.60 | |
| | Garage | -526.67 | 1882.93 |
| GLA2 | Second Floor | 1372.50 | |
| | Stairway | -114.77 | 1257.73 |
| P/P | Covered Patio | 240.00 | 240.00 |
| | | | |
| | **TOTAL LIVABLE** (rounded) | | **3141** |

| LIVING AREA BREAKDOWN | | |
|---|---|---|
| Breakdown | | Subtotals |
| First Floor | | |
| 2.0 x 10.0 | | 20.00 |
| 25.0 x 31.3 | | 782.50 |
| 3.0 x 14.5 | | 43.50 |
| 3.0 x 10.8 | | 32.40 |
| 17.3 x 28.0 | | 484.40 |
| 18.7 x 44.0 | | 822.80 |
| 14.0 x 16.0 | | 224.00 |
| Garage | | |
| 13.7 x 20.5 | | -280.85 |
| 8.5 x 10.0 | | -85.00 |
| 8.6 x 18.7 | | -160.82 |
| Second Floor | | |
| 19.0 x 38.0 | | 722.00 |
| 1.0 x 13.0 | | 13.00 |
| 17.0 x 37.5 | | 637.50 |
| Stairway | | |
| 5.3 x 14.7 | | -77.91 |
| 3.8 x 9.7 | | -36.86 |
| | | |
| **15 Areas Total** (rounded) | | **3141** |

| Client: Lackman, Thomas | File No.: 15193 |
| --- | --- |
| Property Address: 40003 N. Pride Drive | Case No.: |
| City: Anthem (mailing) | State: AZ | Zip: 85086 |



## LOCATION MAP

| | |
|---|---|
| Client: Lackman, Thomas | File No.: 15193 |
| Property Address: 40003 N. Pride Drive | Case No.: |
| City: Anthem (mailing) | State: AZ Zip: 85086 |



| | |
|---|---|
| Client: Lackman, Thomas | File No.: 15193 |
| Property Address: 40003 N. Pride Drive | Case No.: |
| City: Anthem (mailing) | State: AZ Zip: 85086 |



| | |
|---|---|
| Client: Lackman, Thomas | File No.: 15193 |
| Property Address: 40003 N. Pride Drive | Case No.: |
| City: Anthem (mailing) State: AZ | Zip: 85086 |



**FRONT VIEW OF
SUBJECT PROPERTY**



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**

| Client: Lackman, Thomas | File No.: 15193 |
|---|---|
| Property Address: 40003 N. Pride Drive | Case No.: |
| City: Anthem (mailing) | State: AZ Zip: 85086 |



**View to Rear of Yard From Patio**



**Living Room**



**Den**



**Bathroom**



**Dining Room**



**Family Room**

**Subject Photos (Cont.)**

| Client: Lackman, Thomas | | File No.: 15193 |
|---|---|---|
| Property Address: 40003 N. Pride Drive | | Case No.: |
| City: Anthem (mailing) | State: AZ | Zip: 85086 |



Kitchen



Rec Room



Master Bedroom



Master Bathroom



Bathroom



Bedroom

| Client: Lackman, Thomas | File No.: 15193 |
|---|---|
| Property Address: 40003 N. Pride Drive | Case No.: |
| City: Anthem (mailing) | State: AZ | Zip: 85086 |



**COMPARABLE SALE #1**

2362 W. Clearview Trail
203-40-699



**COMPARABLE SALE #2**

40835 N. Majesty Court
203-07-817



**COMPARABLE SALE #3**

3416 W. Thoreau Lane
203-10-591

B10 (Official Form 10) (04/10)

| UNITED STATES BANKRUPTCY COURT   SOUTHERN DISTRICT OF CALIFORNIA | PROOF OF CLAIM |
|---|---|
| Name of Debtor:<br>THOMAS L. LACKMAN | Case Number:  10-10177-LT11<br>Chapter 11 |

NOTE: *This form should not be used to make a claim for an administrative expense arising after the commencement of the case. A request for payment of an administrative expense may be filed pursuant to 11 U.S.C. § 503.*

| | |
|---|---|
| Name of Creditor (the person or other entity to whom the debtor owes money or property): THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS, CWALT, INC., ALTERNATIVE LOAN TRUST 2006-HY12, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HY12 | ☐ Check this box to indicate that this claim amends a previously filed claim. |
| Name and address where notices should be sent:<br>Richard J. Bauer, Jr., Esq., Attorney Bar No. 147314<br>MILES, BAUER, BERGSTROM & WINTERS, LLP<br>1231 E. Dyer Road, Suite 100<br>Santa Ana, CA 92705<br>Telephone number: (714) 481-9100 | Court Claim<br>Number: _____<br>        *(if known)*<br><br>Filed on: _____ |
| Name and address where payment should be sent (if different from above):<br>THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FOR THE CERTIFICATEHOLDERS, CWALT, INC., ALTERNATIVE LOAN TRUST 2006-HY12, MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HY12<br>c/o BAC HOME LOANS SERVICING, LP<br>Mail Stop: TX2-982-03-03<br>7105 Corporate Drive<br>Plano, TX 75024<br><br>Telephone number: | ☐ Check box if you are aware that anyone else has filed a proof of claim relating to your claim. Attach copy of statement giving particulars.<br><br>☐ Check box if you are the debtor or trustee in this case. |

| | |
|---|---|
| **1. Amount of Claim as of Date Case Filed:**   $ 421,768.52<br><br>If all or part of your claim is secured, complete item 4 below; however, if all of your claim is unsecured, do not complete item 4.<br><br>If all or part of your claim is entitled to priority, complete item 5.<br><br>☒ Check this box if claim includes interest or other charges in addition to the principal amount of the claim. Attach itemized statement of interest or charges. | **5.** Amount of Claim Entitled to Priority under 11 U.S.C. §507(a). If any portion of your claim falls in one of the following categories, check the box and state the amount.<br><br>Specify the priority of the claim.<br><br>☐ Domestic support obligations under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). |
| **2. Basis for Claim:**   Money loaned<br>(See instruction #2 on reverse side.) | ☐ Wages, salaries, or commissions (up to $11,725*), earned within 180 days before filing of the bankruptcy petition or cessation of the debtor's business, whichever is earlier – 11 U.S.C. §507 (a)(4). |
| **3. Last four digits of any number by which creditor identifies debtor:**   CWF 6648 / MBBW File No.: 10-02948<br><br>   **3a.** Debtor may have scheduled account as: _____<br>      (See instruction #3a on reverse side.) | ☐ Contributions to an employee benefit plan – 11 U.S.C. §507(a)(5) |
| **4. Secured Claim (See instruction #4 on reverse side.)**<br>Check the appropriate box if your claim is secured by a lien on property or a right of setoff and provide the requested information.<br><br>Nature of property or right of setoff:  ☒ Real Estate  ☐ Motor Vehicle  ☐ Other<br>Describe:<br><br>Value of Property:$ not determined    Annual Interest Rate _____%<br><br>Amount of arrearage and other charges as of time case filed included in secured claim,<br><br>if any: $ 42,210.11 _____   Basis for perfection: Deed of Trust/Mortgage<br><br>Amount of Secured Claim: $ 421,768.52    Amount Unsecured: $ _____ | ☐ Up to $2,600* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use – 11 U.S.C. §507 (a)(7).<br><br>☐ Taxes or penalties owed to governmental units – 11 U.S.C. §507 (a)(8).<br><br>☐ Other – Specify applicable paragraph of 11 U.S.C. §507(a)(____). |
| **6. Credits:** The amount of all payments on this claim has been credited for the purpose of making this proof of claim. | Amount entitled to priority:<br><br>$ _____ |
| **7. Documents:** Attach redacted copies of any documents that support claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. You may also attach a summary. Attach redacted copies of documents providing evidence of perfection of a security interest. You may also attach a summary. *(See Instruction 7 and definition of "redacted" on reverse side.)*<br><br>DO NOT SEND ORIGINAL DOCUMENTS. ATTACH DOCUMENTS MAY BE DESTROYED AFTER SCANNING.<br><br>If the documents are not available, please explain: | *Amounts are subject to adjustment on 4/1/13 and every 3 years thereafter with respect to cases commenced on or after the date of adjustment.* |
| Date: 10/15/10 | **Signature:** The person filing this claim must sign it. Sign and print name and title, if any, of the creditor or other person authorized to file this claim and state address and telephone number if different from the notice address above. Attach copy of power of attorney, if any.<br><br>/s/ Richard J. Bauer, Jr.<br><br>Richard J. Bauer, Jr., Esq., Attorney for Claimant / Attorney Bar No. 147314<br>Miles, Bauer, Bergstrom & Winters, LLP<br>1231 E. Dyer Road, Suite 100, Santa Ana, CA 92705<br>(714) 481-9100 / FAX (714) 481-9144 / File No. 10-02948 | FOR COURT USE ONLY |

*Penalty for presenting fraudulent claim: Fine of up to $500,000 or imprisonment for up to 5 years, or both. 18 U.S.C. §§ 152 and 3571.*

Claim as of June 11, 2010:

Unpaid Principal Balance — $379,558.41

Reinstatement

17 monthly payments at $2,367.05 each — $40,239.85
(February 1, 2009 through June 1, 2010)

Property Inspections — $225.00

Foreclosure Fees and Costs — $1,445.26

Bankruptcy Attorney's Fees and Costs* — $300.00

**TOTAL REINSTATEMENT** — **$42,210.11**

**TOTAL UNPAID PRINCIPAL PLUS REINSTATEMENT** — **$421,768.52**

*Fee Expenses incurred post-petition relating to Protecting Lender's Interest in the Property, the Lien, and Rights Under the Deed of Trust, including, but not limited to, Preparing and Filing the Proof of Claim

10-02948/poc.dot/rlw

**EXHIBIT "1"**

First American Title

OFFICIAL RECORDS OF
MARICOPA COUNTY RECORDER
HELEN PURCELL
20060751930 06/02/2006 04:58
P4502803-20-5-4--
ELECTRONIC RECORDING

After Recording Return To:
COUNTRYWIDE HOME LOANS,
INC.
MS SV-79 DOCUMENT
PROCESSING
P.O.Box 10423
Van Nuys
CA 91410-0423

Prepared By:
DAVID URENA

———————————— [Space Above This Line For Recording Data] ————————————

257-4602803 3/4

[Doc ID #]

## DEED OF TRUST

MIN 1

D2 001 002

DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3,
11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in
Section 16.

(A) "Security Instrument" means this document, which is dated   MAY 26, 2006                ,
together with all Riders to this document.
(B) "Borrower" is
THOMAS L LACKMAN, a married man


Borrower is the trustor under this Security Instrument. Borrower's mailing address is
208 SENECA WAY
SPRING GROVE, PA 17362
(C) "Lender" is
COUNTRYWIDE HOME LOANS, INC.

Lender is a
CORPORATION

organized and existing under the laws of NEW YORK

ARIZONA–Single Family–Fannie Mae/Freddie Mac UNIFORM INSTRUMENT WITH MERS
Page 1 of 11
VMP®-6A(AZ) (0205)        CHL (08/05)(d)   VMP Mortgage Solutions, Inc. (800)521-7291          Form 3003 1/01 (rev. 6/02)
CONV/VA




3



Lender's mailing address is
4500 Park Granada MSN# SVB-314
Calabasas, CA 91302-1613
**(D) "Trustee" is**
FIDELITY NATIONAL TITLE INSURANCE CO

Trustee's mailing address is
15661 REDHILL AVE #200
TUSTIN, CA 92780
**(E) "MERS"** is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.
**(F) "Note"** means the promissory note signed by Borrower and dated   MAY 26, 2006
The Note states that Borrower owes Lender
THREE HUNDRED EIGHTY THOUSAND and 00/100

Dollars (U.S. $ 380,000.00           ) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than   JUNE 01, 2036
**(G) "Property"** means the property that is described below under the heading "Transfer of Rights in the Property."
**(H) "Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.
**(I) "Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

| | | |
|---|---|---|
| [X] Adjustable Rate Rider | [ ] Condominium Rider | [ ] Second Home Rider |
| [ ] Balloon Rider | [X] Planned Unit Development Rider | [ ] 1-4 Family Rider |
| [ ] VA Rider | [ ] Biweekly Payment Rider | [ ] Other(s) [specify] |

**(J) "Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.
**(K) "Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.
**(L) "Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.
**(M) "Escrow Items"** means those items that are described in Section 3.
**(N) "Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.
**(O) "Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.
**(P) "Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.
**(Q) "RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.
**(R) "Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

TRANSFER OF RIGHTS IN THE PROPERTY
The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the

4

**EXHIBIT** 2

repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the                                                    COUNTY                                    of

[Type of Recording Jurisdiction]

MARICOPA                                                    :

[Name of Recording Jurisdiction]

SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF.

Parcel ID Number: 20305923                                          which currently has the
address of

40003 N Pride Dr, Anthem

[Street/City]

Arizona 85086-6012 ("Property Address"):

[Zip Code]

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges. Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.

Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return

5



them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

2. **Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.

Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

3. **Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.

Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.



**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount



not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

6. **Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

7. **Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

8. **Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

9. **Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

10. **Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes

**EXHIBIT 2**

8

available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest



in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**12. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**13. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

**14. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**15. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**16. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any



**EXHIBIT 2**

10

provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b)





"Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including, but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Trustee shall record a notice of sale in each county in which any part of the Property is located and shall mail copies of the notice as prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law and after publication and posting of the notice of sale, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place designated in the notice of sale. Trustee may postpone sale of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property without any covenant or warranty, expressed or implied. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it or to the county treasurer of the county in which the sale took place.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

24. Substitute Trustee. Lender may, for any reason or cause, from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

25. Time of Essence. Time is of the essence in each covenant of this Security Instrument.

**EXHIBIT** 2

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_____ (Seal)
THOMAS L. LACKMAN                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

_____ (Seal)
                                -Borrower

STATE OF ~~ARIZONA~~ PA,                     York County ss:

The foregoing instrument was acknowledged before me this 27 May 2006
by _Thomas L Lackman_, _Micheline B Lackman_
_____
_____
_____

My Commission Expires: 10-26-2009

COMMONWEALTH OF PENNSYLVANIA
NOTARIAL SEAL
Patrick B. Gallagher, Notary Public
York, York County
My commission expires Oct. 26, 2009

_____
Notary Public

-6A(AZ) (0200)    CHL (08/05)    Page 11 of 11    Form 3003 1/01 (rev. 6/02)

EXHIBIT 2

13

# PLANNED UNIT DEVELOPMENT RIDER

After Recording Return To:
COUNTRYWIDE HOME LOANS, INC.
MS SV-79 DOCUMENT PROCESSING
P.O.Box 10423
Van Nuys, CA 91410-0423


Prepared By:
DAVID URENA


[Doc ID #]

THIS PLANNED UNIT DEVELOPMENT RIDER is made this TWENTY-SIXTH day of MAY, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to
COUNTRYWIDE HOME LOANS, INC.

(the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

40003 N Pride Dr
Anthem, AZ 85086-6012
[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
 -7R (0405)   CHL (06/04)(d)        Page 1 of 3                    Initials: _JCCMBL_
                    VMP Mortgage Solutions, Inc. (800)521-7291          Form 3150 1/01



EXHIBIT 2

other such parcels and certain common areas and facilities, as described in
THE COVENANTS, CONDITIONS, AND RESTRICTIONS FILED OF RECORD
THAT AFFECT THE PROPERTY

(the "Declaration"). The Property is a part of a planned unit development known as

Anthem Parkside Community Association &Anthem Community Council,
Inc.
[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or
equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners
Association") and the uses, benefits and proceeds of Borrower's interest.

   PUD COVENANTS. In addition to the covenants and agreements made in the Security
Instrument, Borrower and Lender further covenant and agree as follows:

   A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's
Constituent Documents. The "Constituent Documents" are the (i) Declaration; (ii) articles of
incorporation, trust instrument or any equivalent document which creates the Owners Association; and
(iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay,
when due, all dues and assessments imposed pursuant to the Constituent Documents.

   B. Property Insurance. So long as the Owners Association maintains, with a generally accepted
insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender
and which provides insurance coverage in the amounts (including deductible levels), for the periods,
and against loss by fire, hazards included within the term "extended coverage," and any other
hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance,
then: (i) Lender waives the provision in Section 3 for the Periodic Payment to Lender of the yearly
premium installments for property insurance on the Property; and (ii) Borrower's obligation under
Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent
that the required coverage is provided by the Owners Association policy.

   What Lender requires as a condition of this waiver can change during the term of the loan.

   Borrower shall give Lender prompt notice of any lapse in required property insurance coverage
provided by the master or blanket policy.

   In the event of a distribution of property insurance proceeds in lieu of restoration or repair
following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable
to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the
sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to
Borrower.

   C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure
that the Owners Association maintains a public liability insurance policy acceptable in form, amount,
and extent of coverage to Lender.

   D. Condemnation. The proceeds of any award or claim for damages, direct or consequential,
payable to Borrower in connection with any condemnation or other taking of all or any part of the
Property or the common areas and facilities of the PUD, or for any conveyance in lieu of
condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by
Lender to the sums secured by the Security Instrument as provided in Section 11.

   E. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's
prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or
termination of the PUD, except for abandonment or termination required by law in the case of
substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent
domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the

Initials: *DCC NBL*

 -7R (0405)       CHL (06/04)              Page 2 of 3              Form 3150 1/01

**EXHIBIT** 2

DOC ID #: ████████████

express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

**F. Remedies.** If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and provisions contained in this PUD Rider.

_____ (Seal)
THOMAS L. LACKMAN                                  - Borrower

_____ (Seal)
                                                   - Borrower

_____ (Seal)
                                                   - Borrower

_____ (Seal)
                                                   - Borrower

**EXHIBIT** 2

# FIXED/ADJUSTABLE RATE RIDER

(LIBOR One-Year Index (As Published In *The Wall Street Journal*) - Rate Caps)

THIS FIXED/ADJUSTABLE RATE RIDER is made this TWENTY-SIXTH day of MAY, 2006 , and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Fixed/Adjustable Rate Note (the "Note") to COUNTRYWIDE HOME LOANS, INC.

("Lender") of the same date and covering the property described in the Security Instrument and located at:

40003 N Pride Dr
Anthem, AZ 85086-6012
[Property Address]

THE NOTE PROVIDES FOR A CHANGE IN BORROWER'S FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE. THE NOTE LIMITS THE AMOUNT BORROWER'S ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE BORROWER MUST PAY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    ADJUSTABLE RATE AND MONTHLY PAYMENT CHANGES**

The Note provides for an initial fixed interest rate of 6.500 %. The Note also provides for a change in the initial fixed rate to an adjustable interest rate, as follows:

**4.    ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES**

(A) Change Dates

The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JUNE, 2013 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

• FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)(d)                    Page 1 of 5





EXHIBIT 2



**(B) The Index**

Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

**(C) Calculation of Changes**

Before each Change Date, the Note Holder will calculate my new interest rate by adding TWO & ONE-QUART percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of the monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

**(D) Limits on Interest Rate Changes**

The interest rate I am required to pay at the first Change Date will not be greater than 11.500 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.500 %.

**(E) Effective Date of Changes**

My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER**

1. Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument shall read as follows:

● FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)                    Page 2 of 5

**EXHIBIT** 2

LOAN # : ████████

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

2. When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section A above, Uniform Covenant 18 of the Security Instrument described in Section B.1 above shall then cease to be in effect, and the provisions of Uniform Covenant 18 of the Security Instrument shall be amended to read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

● FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)                    Page 3 of 5

**EXHIBIT 2**

19

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

• FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)                    Page 4 of 5

**EXHIBIT** 2

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Fixed/Adjustable Rate Rider.

_____ (Seal)
THOMAS L.. LACKMAN                               -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

_____ (Seal)
                                                 -Borrower

• FIXED/ARM Rider
Interest First/Only LIBOR One-Year Index
1E460-US (10/05)                 Page 5 of 5

EXHIBIT 2

Escrow No. **257-4602803** (KAK)

LOT 304, OF ANTHEM UNIT 8 CORRECTIVE, ACCORDING TO THE PLAT OF RECORD IN THE OFFICE OF THE COUNTY RECORDER OF MARICOPA COUNTY, ARIZONA, RECORDED IN BOOK 525 OF MAPS, PAGE 28 AND CERTIFICATE OF CORRECTION RECORDED AS 2000-0721936 AND AS 2000-0972082 OF OFFICIAL RECORDS.

**EXHIBIT** 2

ORIGINAL

Prepared by: DAVID URENA

LOAN #: ███

# INTEREST ONLY ADJUSTABLE RATE NOTE
### (One-Year LIBOR Index (As Published In *The Wall Street Journal*)
### Rate Caps -- 10 Year Interest Only Period)

**THIS NOTE CONTAINS PROVISIONS ALLOWING FOR A CHANGE IN MY FIXED INTEREST RATE TO AN ADJUSTABLE INTEREST RATE AND FOR CHANGES IN MY MONTHLY PAYMENT. THIS NOTE LIMITS THE AMOUNT MY ADJUSTABLE INTEREST RATE CAN CHANGE AT ANY ONE TIME AND THE MAXIMUM RATE I MUST PAY.**

MAY 26, 2006                                          ARIZONA
[Date]                        [City]                  [State]

40003 N Pride Dr, Anthem, AZ 85086-6012
[Property Address]

## 1.  BORROWER'S PROMISE TO PAY
In return for a loan that I have received, I promise to pay U.S. $ 380,000.00        (this amount is called "Principal"), plus interest, to the order of Lender. Lender is
COUNTRYWIDE HOME LOANS, INC.
I will make all payments under this Note in the form of cash, check or money order.
I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

## 2.  INTEREST
Interest will be charged on unpaid principal until the full amount of Principal has been paid. I will pay interest at a yearly rate of      6.500 %. The interest rate I will pay may change in accordance with Section 4 of this Note.
The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

## 3.  PAYMENTS
   (A) Time and Place of Payments
I will make a payment on the first day of every month, beginning on   JULY 01, 2006        . Before the First Principal and Interest Payment Due Date as described in Section 4 of this Note, my payment will consist only of the interest due on the unpaid principal balance of this Note. Thereafter, I will pay principal and interest by making a payment every month as provided below.
I will make my monthly payments of principal and interest beginning on the First Principal and Interest Payment Due Date as described in Section 4 of this Note. I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. Each monthly payment will be applied as of its

● MULTISTATE ARM, ONE-YEAR LIBOR, 10-Year Interest Only Period Note
1E452-XX (10/05)(d)                            Page 1 of 5





EXHIBIT 3

scheduled due date, and if the payment includes both principal and interest, it will be applied to interest before Principal. If, on JUNE 01, 2036 , I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at
P.O. Box 10219, Van Nuys, CA 91410-0219
or at a different place if required by the Note Holder.

(B) Amount of My Initial Monthly Payments
Each of my initial monthly payments will be in the amount of U.S. $ 2,058.33 until the first Change Date. After the first Change Date, my monthly payment will be in an amount sufficient to pay accrued interest, at the rate determined as described in Section 4 of this Note until the First Principal and Interest Payment Due Date. On that date and thereafter, my monthly payment will be in an amount sufficient to repay the principal and interest at the rate determined as described in Section 4 of this Note in substantially equal installments by the Maturity Date. The Note Holder will notify me prior to the date of changes in monthly payment.

(C) Monthly Payment Changes
Changes in my monthly payment will reflect changes in the unpaid principal of my loan and in the interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 or 5 of this Note.

## 4. ADJUSTABLE INTEREST RATE AND MONTHLY PAYMENT CHANGES
(A) Change Dates
The initial fixed interest rate I will pay will change to an adjustable interest rate on the first day of JUNE, 2013 , and the adjustable interest rate I will pay may change on that day every 12th month thereafter. The date on which my initial fixed interest rate changes to an adjustable interest rate, and each date on which my adjustable interest rate could change, is called a "Change Date."

(B) The Index
Beginning with the first Change Date, my adjustable interest rate will be based on an Index. The "Index" is the average of interbank offered rates for one-year U.S. dollar-denominated deposits in the London market ("LIBOR"), as published in *The Wall Street Journal*. The most recent Index figure available as of the date 45 days before each Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

(C) Calculation of Changes
Before each Change Date, the Note Holder will calculate my new interest rate by adding
TWO & ONE-QUARTER percentage points ( 2.250 %) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date.

The Note Holder will then determine the amount of my monthly payment. For payment adjustments occurring before the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay all accrued interest each month on the unpaid principal balance at the new interest rate. If I make a voluntary payment of principal before the First Principal and Interest Payment Due Date, my payment amount for subsequent payments will be reduced to the amount necessary to repay all accrued interest on the reduced principal balance at the current interest rate. For payment adjustments occurring on or after the First Principal and Interest Payment Due Date, the amount of my monthly payment will be sufficient to repay unpaid principal and interest that I am expected to owe in full on the Maturity Date at the current interest rate in substantially equal payments.

(D) Limits on Interest Rate Changes
The interest rate I am required to pay at the first Change Date will not be greater than 11.500 % or less than 2.250 %. Thereafter, my adjustable interest rate will never be increased or decreased on any single Change Date by more than two percentage points from the rate of interest I have been paying for the preceding 12 months. My interest rate will never be greater than 11.500 %.

(E) Effective Date of Changes
My new interest rate will become effective on each Change Date. I will pay the amount of my new monthly payment beginning on the first monthly payment date after the Change Date until the amount of my monthly payment changes again.

**EXHIBIT 3**

**(F) Notice of Changes**

Before the effective date of any change in my interest rate and/or monthly payment, the Note Holder will deliver or mail to me a notice of such change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

**(G) Date of First Principal and Interest Payment**

The date of my first payment consisting of both principal and interest on this Note (the "First Principal and Interest Payment Due Date") shall be that date which is the 10th anniversary date of the first payment due date, as reflected in Section 3(A) of the Note.

## 5.  BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under the Note.

I may make a full Prepayment or partial Prepayments without paying a Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of the Note. If I make a partial Prepayment, there will be no changes in the due date of my monthly payment unless the Note Holder agrees in writing to those changes. If the partial Prepayment is made during the period when my monthly payments consist only of interest, the amount of the monthly payment will decrease for the remainder of the term when my payments consist only of interest. If the partial Prepayment is made during the period when my payments consist of principal and interest, my partial Prepayment may reduce the amount of my monthly payments after the first Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6.  LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7.  BORROWER'S FAILURE TO PAY AS REQUIRED

**(A) Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of   FIFTEEN                calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be         5.000  % of my overdue payment of interest, during the period when my payment is interest only, and of principal and interest thereafter. I will pay this late charge promptly but only once on each late payment.

**(B) Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C) Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

**(D) No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E) Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**EXHIBIT** 3



## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. UNIFORM SECURED NOTE

This Note is a uniform instrument with limited variations in some jurisdictions. In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of those conditions read as follows:

(A)  Until my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument shall read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

(B)  When my initial fixed interest rate changes to an adjustable interest rate under the terms stated in Section 4 above, Uniform Covenant 18 of the Security Instrument described in Section 11(A) above shall then cease to be in effect, and Uniform Covenant 18 of the Security Instrument shall instead read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

♦ MULTISTATE ARM, ONE-YEAR LIBOR, 10-Year Interest Only Period Note
1E452-XX (10/05)                                        Page 4 of 5

**EXHIBIT  3**

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_____ (Seal)
THOMAS L. LACKMAN                           -Borrower

_____ (Seal)
                                            -Borrower

_____ (Seal)
                                            -Borrower

_____ (Seal)
                                            -Borrower

*[Sign Original Only]*

● MULTISTATE ARM, ONE-YEAR LIBOR, 10-Year Interest Only Period Note
1F452-XX (10/05)                            Page 5 of 5

**EXHIBIT** 3

Recording requested by:
MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. (MERS)

**AND WHEN RECORDED MAIL DOCUMENT
AND TAX STATEMENTS TO:**

BAC HOME LOANS SERVICING, LP
400 NATIONAL WAY, MS SV-46
SIMI VALLEY, CA 93065

10-02948
APN: 20305923

_____
SPACE ABOVE THIS LINE FOR RECORDER'S USE

## CORPORATION ASSIGNMENT OF DEED OF TRUST/MORTGAGE

FOR VALUE RECEIVED, THE UNDERSIGNED HEREBY GRANTS, ASSIGNS AND TRANSFERS TO:

**THE BANK OF NEW YORK MELLON FKA THE BANK OF NEW YORK, AS TRUSTEE FO
RTHE CERTIFICATEHOLDERS, CWALT, INC., ALTERNATIVE LOAN TRUST 2006-HY12,
MORTGAGE PASS-THROUGH CERTIFICATES, SERIES 2006-HY12**

ALL BENEFICIAL INTEREST UNDER THAT CERTAIN DEED OF TRUST DATED 05/26/2006, EXECUTED BY:
THOMAS L. LACKMAN, TRUSTOR: TO FIDELITY NATIONAL TITLE INSURANCE CO., TRUSTEE AND
RECORDED ON 06/02/2006 UNDER INSTRUMENT NO. 20060751930, OF OFFICIAL RECORDS IN THE COUNTY
RECORDER'S OFFICE OF MARICOPA COUNTY, IN THE STATE OF ARIZONA. APN: 20305923

DESCRIBING THE LAND THEREIN: AS MORE FULLY DESCRIBED IN SAID DEED OF TRUST/MORTGAGE.

DATED:  **OCT  8 2010**

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC.
(MERS)

BY: _____

**Nichole Clavadetscher
Certifying Officer**

State of:    **California**    )

County of:   **Ventura**    )

On **OCT  8 2010** before me, **Jon Secrist** , notary public, personally appeared **Nichole Clavadetscher** ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within
instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by
his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the
instrument.

I certify under PENALTY OF PERJURY under the laws of the State of _____ **California** _____ that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

JON SECRIST
Commission # 1893947
Notary Public - California
Ventura County
My Comm. Expires Jul 24, 2014

**EXHIBIT 3**

28

| | |
|---|---|
| 1 | **PROOF OF SERVICE** |
| 2 | I, __Sandra Garcia__, certify that I am a resident of Orange County, I am |
| 3 | over the age of eighteen (18) and not a party to the within action, and that my business |
| 4 | address is: 1231 E. Dyer Road, Suite 100, Santa Ana, CA 92705. |
| 5 | On __10/15/10__, I served the within **Proof of Claim** on interested |
| 6 | parties in this proceeding by placing a true and correct copy thereof enclosed in a sealed |
| 7 | envelope with postage pre-paid in the United States Mail at Santa Ana, California, addressed |
| 8 | as follows: |

DEBTOR:
Thomas L. Lackman
2540 Northside Drive Apt 104
San Diego, CA 92108

I declare that I am employed in the Office of a Member of the Bar at whose direction the Service was made.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on __10/15/10__, at Santa Ana, California.

__/s/ Sandra Garcia__

10-02948